# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NICHOLAS CORREIAEverso, DONNA CORDEIRO, JANICE ANGELILLO, ANNA MARIA FORNINO, MICHELE CASSETTA, JUDY CENNAMI, JANICE BRADY, OPAL ASH, MARK LEJEUNE, and ROBERTO PRATS, on behalf of themselves and others similarly situated, | C.A. No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | |
| EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York corporation, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.............................................................................................................i

I.    INTRODUCTION ............................................................................................................2

II.   DEFINITIONS..................................................................................................................4

III.  JURISDICTION AND VENUE........................................................................................5

IV.   PARTIES ..........................................................................................................................6

A.    Plaintiffs...........................................................................................................................6

B.    Defendants .......................................................................................................................8

V.    FACTUAL ALLEGATIONS............................................................................................9

A.    The Market for Electricity in the United States .............................................................9

B.    The New England Electricity Market.............................................................................10

C.    The New England Natural Gas Market ..........................................................................14

D.    Defendants Possess Substantial Market Power in the Market for Natural Gas and Electricity Within the New England Regional Market.....................................................16

E.    Defendants Unlawfully Abused Their Market Power by Artificially Restricting Natural Gas Supply and Artificially Raising Electricity Prices in the New England Regional Market. ....................................18

F.    Extensive Academic Analysis of Empirical and Statistical Data, as Reflected in the Vertical Market Power Study, Reveal Defendants' Manipulation of Natural Gas Supply and Electricity Prices in the New England Regional Market. ..................................................................................................20

G.    Defendants' Manipulation of Natural Gas Capacity and Electricity Prices Also Increased the Value of their Renewable Energy Generation Assets and the Profits Earned from Them. ...................................27

H.    Defendants' Anticompetitive Conduct, As Alleged, Is the Subject of Numerous Governmental Regulatory Investigations or Reviews ......................................................28

VI.   TOLLING OF STATUTE OF LIMITATIONS ..............................................................29

VII.  CLASS ACTION ALLEGATIONS................................................................................29

A.    Eversource Federal Law Class.......................................................................................30

B.    Avangrid Federal Law Class..........................................................................................32

C.    Federal Injunctive Relief Class......................................................................................35

D.    Eversource State Law Classes – Asserting State Law Claims Against Eversource.........37

E.    Avangrid Main State Law Class – Asserting Maine State Law Claims Against Avangrid ................41

VIII. VIOLATIONS ALLEGED .............................................................................................44

DEMAND FOR RELIEF........................................................................................................59

JURY TRIAL DEMANDED ..................................................................................................61

Plaintiffs, all of whom are consumers of electricity in New England, by and through their attorneys, Berger & Montague, P.C., individually and on behalf of others similarly situated, state and alleges as follows.

## I.      INTRODUCTION

1.      This antitrust and consumer class action seeks monetary damages and injunctive relief on behalf of Plaintiffs and certain classes of New England energy consumers who paid supracompetitive prices for natural gas and electricity during the period from August 1, 2013 through at least July 31, 2016 ("Class Period").

2.      Plaintiffs and the proposed Classes were harmed by the unlawful abuse of substantial market power wielded by two of New England's largest energy companies -- Defendants Eversource Energy and Avangrid, Inc. ("Defendants").

3.      Defendants utilized their natural gas businesses – exploiting their ability to reserve and then cancel critical pipeline capacity without penalty when it was too late for other market participants to meet demand – to reduce natural gas supplies and increase natural gas prices, particularly during the New England Winter. Because the market for electricity generation – for which Defendants are two of the largest producers in New England – is dependent upon the supply and price of natural gas, Defendants' manipulation of natural gas capacity in New England artificially inflated the price paid by all power plants in New England that generate electricity from natural gas (including Defendants'), thereby increasing the cost of natural gas and electricity purchased by Plaintiffs and the Classes regardless of which entity supplied them.

4.      Empirical and statistical analysis of the markets for retail and wholesale natural gas and retail electricity in New England reveals that as a result of Defendants' unlawful

manipulation, Plaintiffs and the Classes overpaid for electricity alone by at least 20% or $3.6 billion during the Class Period.

5.       Plaintiffs seek relief under various state laws on behalf of themselves and certain classes, as specified herein, of similarly situated New England electricity consumers who purchased electricity for their own use and not for resale during the Class Period. Plaintiffs bring claims against Eversource and Avangrid under the laws of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont on behalf of themselves and subclasses of electricity consumers in those states.

6.       Plaintiffs who purchased electricity from Defendants and/or their subsidiaries or affiliates (collectively, the "Customer Plaintiffs") seek damages and other relief under federal antitrust law for anticompetitive injuries sustained as a result of Defendants' unlawful conduct. Customers of Eversource, on behalf of themselves and a class of similarly situated electricity consumers in Connecticut, Massachusetts, and New Hampshire, and customer of Avangrid, on behalf of themselves and a class of similarly situated electricity consumers in Maine, bring claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, restitution, disgorgement of profits, costs of suit, and reasonable attorneys' fees as a result of Defendants' violations of those antitrust statutes.

7.       All Plaintiffs seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, on behalf of themselves and a class of all electricity consumers in New England to cease Defendants' anticompetitive conduct and resulting injury to Plaintiffs and the Class.

## II.    DEFINITIONS

8.    The exact time period of Defendants' anticompetitive conduct is unknown to Plaintiffs with precision, but that unlawful conduct began no later than August 1, 2013, continued through at least July 31, 2016, and ended or will end on the date the effects of Defendants' anticompetitive conduct end (the "Class Period").

9.    Plaintiffs Nicholas Correia, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, Judy Cennami, Janice Brady, Opal Ash, Mark Lejeune, and Roberto Prats ("Plaintiffs") resided and purchased electricity in the New England Regional Electricity Market, for their own use and not for resale, during the Class Period.

10.    Plaintiffs Nicholas Correia, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, Judy Cennami, Janice Brady, and Opal Ash ("Customer Plaintiffs") are consumers who purchased electricity in the New England Regional Electricity Market, for their own use and not for resale, from Defendants and/or their subsidiaries or affiliates during the Class Period.

11.    Plaintiffs Nicholas Correia, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, and Judy Cennami ("Eversource Plaintiffs") are consumers who purchased electricity in the New England Regional Electricity Market, for their own use and not for resale, from Eversource and/or its subsidiaries or affiliates during the Class Period.

12.    Plaintiffs Janice Brady and Opal Ash ("Avangrid Plaintiffs") are consumers who purchased electricity in the New England Regional Electricity Market, for their own use and not for resale, from Avangrid and/or its subsidiaries or affiliates during the Class Period.

13.    Plaintiffs Mark Lejeune and Robert Prats ("Market Plaintiffs") are consumers who purchased electricity in the New England Regional Electricity Market, for their own use and not

4

for resale, from entities other than Defendants and/or their subsidiaries or affiliates during the Class Period.

### III.    JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction under Section 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act, under 28 U.S.C. §§ 1331 and 1337.

15.    This court also has jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because each of the Defendants conducts substantial business in the state of Massachusetts. Defendant, Eversource Energy, is a Massachusetts voluntary association with a headquarters in Boston. Defendants purposefully availed themselves of the laws of the United States and Massachusetts insofar as they engaged in electric and/or natural gas utility business in the United States and in Massachusetts.

16.    The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 § 1367, because the state law claims arise under the same case or controversy as the claims under federal law.

17.    This Court also has subject matter jurisdiction over Plaintiffs' state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount of damages incurred by Plaintiffs, as a result of Defendants' unlawful conduct, exceeds $5 million, exclusive of interest and costs, and various members of the Plaintiffs' respective state-law classes are citizens of a state different from any Defendant.

18.    Venue is proper in this District under Section 12 of the Clayton Act and under the federal venue statute, 28 U.S.C. § 1391, because each Defendant transacts business in this District and/or is a resident of this District, and because a substantial part of the events giving rise to this claim occurred in this District.

## IV.    PARTIES

### A.    Plaintiffs

19.    Plaintiff Nicholas Correia is a resident of Ludlow, Massachusetts. Throughout the Class Period, Mr. Correia purchased electricity from Eversource for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Correia was forced to pay artificially inflated prices for electricity.

20.    Plaintiff Donna Cordeiro is a resident of New Bedford, Massachusetts. Throughout the Class Period, Ms. Cordeiro purchased electricity from Eversource for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Cordeiro was forced to pay artificially inflated prices for electricity.

21.    Plaintiff Janice Angelillo is a resident of Rocky Hill, Connecticut. Throughout the Class Period, Ms. Angelillo purchased electricity from Eversource for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Angelillo was forced to pay artificially inflated prices for electricity.

22.    Plaintiff Anna Maria Fornino is a resident of Newington, Connecticut. Throughout the Class Period, Ms. Fornino purchased electricity from Eversource, for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Fornino was forced to pay artificially inflated prices for electricity.

23.    Plaintiff Michele Cassetta is a resident of Whitefield, New Hampshire. Throughout the Class Period, Ms. Cassetta purchased electricity from Eversource for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Cassetta was forced to pay artificially inflated prices for electricity.

24.     Plaintiff Judy Cennami is a resident of Portsmouth, New Hampshire. Throughout the Class Period, Ms. Cennami purchased electricity from Eversource for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Cennami was forced to pay artificially inflated prices for electricity.

25.     Plaintiff Janice Brady is a resident of Hermon, Maine. Throughout the Class Period, Ms. Brady purchased electricity from Avangrid and its subsidiary, Central Maine Power, for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Brady was forced to pay artificially inflated prices for electricity.

26.     Plaintiff Opal Ash is a resident of Belfast, Maine. Throughout the Class Period, Ms. Ash purchased electricity from Avangrid and/or its subsidiary, Central Maine Power for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Ash was forced to pay artificially inflated prices for electricity.

27.     Plaintiff Roberto Prats is a resident of Puerto Rico and maintains a second residence in Stowe, Vermont. Throughout the Class Period, Mr. Prats purchased electricity from Stowe Electric for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Prats was forced to pay artificially inflated prices for electricity.

28.     Plaintiff Mark Lejeune is a resident of Pawtucket, Rhode Island. Throughout the Class Period, Mr. Lejeune purchased electricity from National Grid for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Lejeune was forced to pay artificially inflated prices for electricity.

B.     Defendants

29.     Defendant Eversource Energy ("Eversource") is a Massachusetts voluntary association. Eversource maintains a headquarters in Boston, Massachusetts. Eversource is a public utility holding company primarily engaged in the energy delivery business, at least in part through six wholly-owned subsidiaries: NSTAR Electric Company, NSTAR Gas Company, Western Massachusetts Electric Company, The Connecticut Light and Power Company, Public Service Company of New Hampshire, and Yankee Gas Services Company. Collectively, Eversource and its subsidiaries serve more than 3.1 million electricity customers in 500 New England communities and more than half-a-million natural gas customers in 120 New England communities. Eversource operates the largest energy delivery system in the region and it also owns a number of power plants in Massachusetts, New Hampshire, and Maine. Eversource operations generate approximately $8 billion in revenue each year.

30.     Defendant Avangrid, Inc. ("Avangrid"), is a New York corporation headquartered in New Haven, Connecticut.  Through its wholly-owned subsidiary, Avangrid Networks, Inc., and at least in part through additional owned subsidiaries and/or affiliates, Avangrid owns electric generation, transmission, and distribution companies and natural gas distribution, transportation, and sales companies in New York, Maine, Connecticut, and Massachusetts. Avangrid directly owns The Berkshire Gas Company ("BCG"), The United Illuminating Company, The Southern Connecticut Gas Company, Connecticut Natural Gas Corporation, Central Maine Power Company, and Maine Natural Gas Corporation. Collectively, Avangrid serves more than 929,000 electricity customers and more than 400,000 natural gas customers in New England. Through another wholly-owned subsidiary, Avangrid Renewables Holdings, Inc., Avangrid owns electricity generating facilities in many states, including Massachusetts and New Hampshire.

## V.    FACTUAL ALLEGATIONS

### A.    The Market for Electricity in the United States

31.    The market for electricity generation is divided into ten distinct geographic regions throughout the majority of the United States with each region serving as an independent regional market.

32.    The independent regional markets in the United States, generally, consist of: California Independent System Operator ("CAISO") which centrally dispatches generation and coordinates the movement of wholesale electricity in California and a portion of southwestern Nevada; MISO which operates the transmission system and a centrally dispatched market in portions of 15 states in the Midwest and the South, extending from Michigan and Indiana to Montana and from the Canadian border to the southern extremes of Louisiana and Mississippi; ISO-NE which is the Independent System Operators ("ISOs") or Regional Transmission Organizations ("RTOs") for New England and is responsible for operating wholesale power markets that trade electricity, capacity, transmission congestion contracts and related products, in addition to administering auctions for the sale of capacity for Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont; New York Independent System Operator ("NYISO") which is responsible for operating wholesale power markets that trade electricity, capacity, transmission congestion contracts, and related products, in addition to administering auctions for the sale of capacity throughout New York state; Northwest Power Pool (NWPP), the Rocky Mountain Power Area (RMPA) and the Arizona, New Mexico, Southern Nevada Power Area (AZ/NM/SNV) within the Western Electricity Coordinating Council (WECC), a regional entity, which, include all or major portions of the states of Washington, Oregon, Idaho, Wyoming, Montana, Nevada and Utah, a small portion of Northern California and the Canadian provinces of

British Columbia and Alberta; PJM Interconnection which centrally dispatches generation and coordinates the movement of wholesale electricity in all or part of 13 states (Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia and West Virginia) and the District of Columbia; the Southeast electricity market which includes all or parts of Florida, Georgia, Alabama, Mississippi, North Carolina, South Carolina, Missouri and Tennessee; the Southwest electric market which encompasses Arizona, New Mexico, southern Nevada (AZ/NM/SNV) and the Rocky Mountain Power Area (RMPA) sub-regions of the Western Electric Coordinating Council (WECC); the Southwest Power Pool (SPP) which manages transmission in fourteen states (Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas and Wyoming); and the Electric Reliability Council of Texas ("ERCOT") which serves as an independent system operator, managing the flow of electrical power to 24 million customers in the state of Texas.

33.     The regional markets for electric generation in the United States are overseen by either ISOs or RTOs. An RTO is an electric power transmission system operator ("TSO") which coordinates, controls and monitors a multi-state electric grid. RTOs are intended to promote economic efficiency, reliability and non-discriminatory practices in the generation of electricity with reduced government oversight. ISOs coordinate, control and monitor the operation of the electrical power system, usually within a single US State, but sometimes encompassing multiple states.

**B.     The New England Electricity Market**

34.     ISO-NE is responsible for operating wholesale power markets that trade electricity, capacity, transmission congestion contracts and related products, in addition to

administering auctions for the sale of capacity and power system planning in New England, consisting of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont. ISO-NE operates New England's high-voltage transmission network and performs long-term planning for the New England system. ISO-NE market serves 7.1 million retail electricity customers and an overall population of 14.7 million people.[1]

35.    The marketplace for wholesale electricity in New England includes two electric energy markets known as a "multi-settlement" system which includes a Day-Ahead Energy Market and a Real-Time Energy Market.

36.    The Day-Ahead Energy Market is designed to allow electricity generators and wholesale electricity buyers like Load Serving Entities (LSEs), commonly referred to as "utilities," to commit to buy or sell wholesale electricity one day before the operating day. LSEs provide electric service to end-users and wholesale customers. The Day-Ahead Energy Market is intended to reduce price volatility. This market produces one financial settlement for completed transactions.

37.    The Real-Time Energy Market enables electricity generators and wholesale electricity buyers like LSEs to buy and sell wholesale electricity during the course of the operating day. The Real-Time Energy Market is intended to balance the differences between day-ahead commitments and the actual real-time demand for and production of electricity. The Real-Time Energy Market produces a separate, second financial settlement. It establishes the real-time locational marginal price (LMP) that is either paid or charged to participants in the Day-Ahead Energy Market for demand or generation that deviates from the day-ahead commitments. Because demand, prices, and other variables change over time, electricity generators and wholesale

---

[1] ISO-NE, New England's Electricity Use, https://www.iso-ne.com/about/key- stats/electricity-use.

electricity buyers in the Real-Time Market conduct same-day transactions to account for those last-minute changes.

38.     Wholesale electricity prices for the Real-Time Market are projected on a rolling basis by ISO-NE, in five-minute increments, throughout the day. ISO-NE determines individual wholesale electricity prices for eight "wholesale load zones" in New England of which five are in Massachusetts and one for each of the other five New England states. The individual wholesale electricity price established by ISO-NE for each wholesale load zone is called a "locational marginal price" ("LMP"). Several factors influence LMPs; however, LMPs and wholesale energy prices in the New England Regional Energy Market are primarily determined by a uniform daily energy price paid to electricity generators.

39.     On a daily basis, LSEs estimate the amount of electricity they will need to serve their customers on the following day and then submit bids to ISO-NE for their anticipated capacity. Using the LSEs' estimates, ISO-NE estimates the total electricity demand for the New England region. Once ISO-NE has the total demand estimate, it conducts what is known as a "day ahead" auction in which ISO-NE obtains bids for supply and price from entities that generate electricity. Entities that generate electricity can offer to supply a certain volume of power at a certain price for the day that corresponds to the bid.

40.     ISO-NE accepts bids in ascending order until it has accepted bids for supply that reflects sufficient volume to meet New England's projected electricity demand. The collective accepted bids are known as an electricity "supply stack," or an "economic dispatch stack."

41.     Although the supply prices reflected in the bids that form the contacts in the supply stack differ, the price of the last accepted bid in the day ahead is the used as the price paid to all of the generators whose bids were accepted in that particular day ahead auction. Therefore, the energy

supplier with the highest accepted bid in a day ahead auction sets the price for all suppliers in the stack. The price established in the day-ahead auction is used to calculate wholesale electricity prices and LMPs throughout the New England Regional Energy Market. The prices paid to electric generators in the supply stack largely determine the price paid by retail customers because they pay the wholesale electricity prices paid by LSEs. In addition to the wholesale cost of electricity charged to retail consumers, LSEs may impose charges for transmission, distribution, transition, reliability, the cost of contracts for electricity purchased from generators or other suppliers, premiums the supplier charges for shielding retail customers and others from wholesale cost volatility, administrative costs, profit and other charges approved by each state.

42.     Importantly, almost one-half of all of the electricity consumed in the New England Regional Energy Market is generated by natural gas-fired power plants.[2] Natural gas, in turn, is the most significant variable cost for natural gas-fired power plants. Thus, the price that natural gas-fired power plant operators pay for natural gas has a significant and direct impact on the price at which they bid to ISO-NE for the supply stack each day. Consequently, the price of natural gas is one of the primary drivers of the daily clearing price that results from the day-ahead auction.

43.     Natural gas-fired power plants purchase the vast majority of their gas on the wholesale spot market. Generally, natural gas-fired power plant owners determine their cost to generate electricity – which determines the sales price bid at which to sell electricity – based on the predicted "spot market" price of natural gas on the day for which they plan to generate the electricity.

44.     The price at which natural gas can be purchased by natural gas-powered plants is the spot market price. Thus, the spot market price is the price at which natural gas-powered plant

---

[2] ISO-NE, Resource Mix, https://www.iso-ne.com/about/key-stats/resource-mix.

operators purchase natural gas to burn if their bids are accepted into the supply stack and they are called upon by ISO-NE to generate electricity. Therefore, the spot market price of natural gas directly and substantially influences the price at which natural gas-fired power plant operators can and do bid in the day-ahead auction to sell wholesale electricity. Because almost half of all of the electricity consumed in the New England Regional Energy Market is generated by natural gas-fired power plants, the spot price significantly impacts the wholesale and retail price of electricity sold to consumers in New England, such as Plaintiffs and members of the proposed Classes. Defendants' ability to use penalty free contracts to cancel significant capacity of natural gas on a key supply pipeline at the last minute – without the ability of the market to make up for the lost capacity – enabled them to restrict natural gas supply, thereby increasing the spot market price of natural gas and with it the price of electricity throughout New England Regional Energy Market during the Class Period.

## C.    The New England Natural Gas Market

45.    Defendants possess and operate Local Distribution Companies ("LDCs"). LDCs are natural gas utilities that primarily supply natural gas to retail customers. LDCs are to the natural gas market what LSEs are to the electricity market.

46.    Natural gas is delivered to and distributed within New England by two pipelines of which the primary pipeline is the Algonquin Gas Transmission Pipeline ("Algonquin Pipeline"). As LDCs, Defendants retain contractual rights that give them the right to order and utilize natural gas transmission capacity on the Algonquin pipeline. Defendants' contracts permit them to order natural gas pipeline capacity on the Algonquin pipeline one day before the capacity is to be used. Typically, such contracts allow the pipeline operator to impose penalties on LDCs if they fail to use the full capacity that they ordered, or if they utilize more capacity than they ordered. However,

Defendants are unique in that regard. As LDCs with legacy contracts, Defendants are permitted to adjust their pipeline capacity orders during the day on which they had ordered the capacity. Critically, the Defendants' legacy contracts allow them to adjust downward the volume of capacity that they had reserved on the Algonquin Pipeline even in the final few hours of the day. As such, Defendants are uniquely positioned to reduce the capacity on the Algonquin Pipeline only hours before the capacity was to have been used and do so without penalty. In fact, Defendants profit greatly from their penalty free cancellation – and resulting capacity reduction – on the Algonquin Pipeline because the reduction in natural gas capacity has the direct effect of raising the price of electricity generated by Defendants and purchased by residents of New England, including Plaintiffs and the Classes.

47.     Defendants profit and Plaintiffs and the Classes pay more for electricity because the volume of natural gas available to gas-fired natural gas power generation plants is limited by the total pipeline capacity and, more importantly, the volume of the existing pipeline used to actually delivery natural gas on a given day. As demonstrated below, unlike the other 25 capacity suppliers on the Algonquin Pipeline, Defendants systematically and repeatedly adjusted their day-ahead transmission capacity orders downward in the final hours of the day leaving insufficient time to enable other market participants to supply the newly available capacity.

48.     When demand exists for the newly available capacity and that demand cannot be met by market participants other than Defendants, the price of natural gas necessarily rises and with it the price of electricity generated by natural gas-fired plants. That is so because LDCs and their retail customers, such as Plaintiffs and members of the Classes, pay for natural gas through long-term "priority" contracts for natural gas supply. However, natural gas-fired power plants that

generate electricity by burning natural gas typically purchase natural gas in real-time, or one day ahead, on the spot market, as discussed below.

49.    Typically, the real time price at which natural gas can be purchased at nodes along the Algonquin Pipeline and then distributed to a particular delivery point determine the spot market price for natural gas in the New England Regional Energy Market. Ultimately, the spot price for natural gas is largely determined by available volume when and as needed. Thus, when Defendants artificially manipulated the capacity of natural gas flowing on the Algonquin Pipeline – by lowering it – they caused the spot market natural gas prices to increase which raised wholesale and retail electricity costs for Plaintiffs and the Classes.

**D.    Defendants Possess Substantial Market Power in the Market for Natural Gas and Electricity Within the New England Regional Market.**

50.    Market power is the ability of a firm (or group of firms), such as Defendants, to raise and maintain price above the level that would prevail under competition. The unlawful exercise of market power reduces output, artificially raises prices and results in the loss of economic welfare.

51.    Defendants possess considerable market power in the New England Regional Market because they own or control assets for the distribution and sale of retail natural gas, retail electric and electricity generation. Specifically, Defendants own or operate substantial natural gas distribution and sales businesses and the ability to substantially influence natural gas transmission capacity on the Algonquin Pipeline and own or operate substantial electricity distribution, sales, and generation businesses, including the ownership of power plants that are both fueled by natural gas as well as those that are not fueled by natural gas that also benefit as retail electricity prices rise.

52.      Specifically, Defendants operate LDCs that, together, serve more than 900,000 natural gas customers in New England. Defendants' LDCs have and utilize large quantities of penalty free "no-notice" contracts for natural gas transmission capacity on the Algonquin Pipeline that they can and do routinely utilize to reduce irreplaceable but needed capacity in the last few hours of the day. Defendants also own and operate non-natural gas-fired electricity generating assets in the New England Regional Market that directly compete against natural gas-fired power plants. As a result, the electricity generated by Defendants' non-natural gas-fired electricity generating assets is more profitable as natural gas supply is reduced and the spot price of natural gas rises. In addition, Defendants operate retail electric utilities that sell electricity to Plaintiffs and members of the Classes, consisting of millions of residential, commercial, and industrial customers in New England Regional Market. Because the price at which Defendants sell electricity to their retail customers is largely driven by the wholesale price of energy in the New England Regional Market, when Defendants cause the wholesale price of electricity to rise so too does the price of the electricity that they sell to their retail customers such as Plaintiffs and members of the Classes.

53.      Defendants abused their market power by manipulating the price of natural gas and electricity in the New England Regional Market by reducing the capacity of natural gas supplied by the Algonquin Pipeline which is a key source of natural gas supply in New England. Doing so enabled the Defendants to increase the price of natural gas and electricity above the prices that would have prevailed but for their anticompetitive restriction of the supply of natural gas. Defendants' ability to reduce the supply of natural gas and, thereby, increase the spot market price of natural gas above that which would have prevailed absent Defendants' manipulation enabled them to profit through the increased use of and higher prices paid for electricity from their non-gas-fired electric power plants.

E.    **Defendants Unlawfully Abused Their Market Power by Artificially Restricting Natural Gas Supply and Artificially Raising Electricity Prices in the New England Regional Market.**

54.    During the Class Period, New England's wholesale natural gas and electricity markets experienced severe, concurrent price spikes. For example, during the winter of 2013-2014, New England experienced months of extreme cold attributed to the so called "Polar Vortex." During that time, New England gas prices averaged $17.86 per MMBtu (million British Thermal Units) and reached a record high of $78/MMBtu on January 22, 2014. As such, New England gas prices were, at times, almost four times the Henry Hub price which is the benchmark price for natural gas traded in the United States and is pricing point for natural gas futures contracts traded on the New York Mercantile Exchange and the OTC swaps traded on Intercontinental Exchange (ICE). New England's extreme price spikes have been attributed by some to limited pipeline capacity serving New England. Indeed, according to Gordon van Welie, CEO, ISO-NE: "[t]he volatility we saw last year [2015] in wholesale power prices - going from the third-highest monthly price in February to the lowest in June....illustrates the impact of....natural gas pipeline constraints, on the region's power system."

55.    "Natural gas pipeline constraints" alone do not explain the extreme prices of natural gas and electricity in New England. Rather, such prices are the result, in part, of a simple and classic anticompetitive scheme to artificially restrict supply made possible by Defendants' role as suppliers of natural gas and generators of electricity who possess the no-penalty contacts for the last minute cancellation of supply on the Algonquin Pipeline. Academic analysis demonstrates that the prices of natural gas and electricity in New England are, in part, the direct and proximate result of Defendants' anticompetitive scheme to artificially restrict the availability of natural gas supply by knowingly reserving more pipeline capacity than they needed and then cancelling some or all

18

of the reserved capacity when they knew that it was too late for other market participants to use the previously reserved but unused created capacity to meet demand.[3]

56.　Defendants routinely made day-ahead orders of natural gas that substantially exceeded the amount of gas they ultimately purchased. The Vertical Market Power Study demonstrates "empirically that capacity withholding occurred on the Algonquin pipeline, and that it resulted in significant levels of pipeline capacity going unused in aggregate. Moreover, withholding occurred at only a small subset of LDC-designated delivery nodes operated by just two parent energy companies that also own significant generation capacity in the region. These nodes are primarily located in Connecticut, where revenue-sharing rules are least generous to LDCs, and they are disproportionately served by no-notice contracts that allow shippers to make large schedule adjustments without incurring imbalance penalties."

57.　According to the Vertical Market Power Study, researchers detected "a unique pattern exhibited by a handful of nodes wherein shippers consistently reserve more capacity than they use to actually flow gas. These shippers avoid incurring imbalance penalties designed to prevent this type of overscheduling by reducing their scheduled quantity at the last moment, such that their final scheduled quantity matches what they actually owed." The study also observed that "withholding increases in both magnitude and variance in the winter months, when greater demand for gas for both heating and generation increases the value of the fixed stock of pipeline capacity."

58.　Critically, the Vertical Market Study demonstrated that two shippers – identified as Defendants Eversource and Avingrid – were responsible for the anomalous overscheduling on the Algonquin Pipeline. As such, the authors traced the Defendants' artificial natural gas

---

[3] Levi Marks, Charles F. Mason, Kristina Mohlin, and Matthew Zaragoza-Watkins, Vertical Market Power in Interconnected Natural Gas and Electricity Markets (October 11, 2017), https://www.edf.org/sites/default/files/vertical-market-power.pdf ("Vertical Market Power Study).

withholding conduct to the wholesale electricity market to conclude the Defendants' withholding of natural gas pipeline capacity artificially raised the rates paid for electricity by Plaintiffs and members of the proposed Classes, as well as fuel suppliers, by approximately 20% or $3.6 billion.

F.    **Extensive Academic Analysis of Empirical and Statistical Data, as Reflected in the Vertical Market Power Study, Reveal Defendants' Manipulation of Natural Gas Supply and Electricity Prices in the New England Regional Market.**

59.    Defendants' manipulation of natural gas supply by making downward adjustments of natural gas orders at the last minute regularly restricted the amount of natural gas supply available along the Algonquin Pipeline over at least a three-year period. The statistical analysis reflected in the Vertical Market Power Study reveals that Defendants' manipulation of the natural gas supply artificially raised natural gas prices which, in turn, directly raised electricity prices by approximately 20% which represents an artificial inflation of the price of electricity in the New England Regional Market of an estimated $3.6 billion.

60.    The Algonquin Pipeline, owned by Endbrige, Inc., is the subject of study in the Vertical Market Power Study. The Algonquin Pipeline transports 3.08 Bcf/d[4] of natural gas through 1,129 miles of pipeline through New Jersey, New York, Connecticut, Rhode Island and Massachusetts, connecting to the Texas Eastern Transmission and the Maritimes & Northeast pipelines. As such, the Algonquin Pipeline is a critical conduit for the supply of natural gas in the New England Regional Energy Market. The Algonquin Pipeline runs through New England as

---

[4] Bcf/d means billion cubic feet per day, a unit of measurement for large production rates of natural gas.

follows:



61.    Defendants' conduct artificially increased the clearing price for generating energy

resources in the New England Regional Energy Market which increased the price of energy paid

to all generating resources in the supply stack. These higher energy prices, in turn, raised wholesale

electricity prices and the retail prices paid by Plaintiffs and the Class. Thus, Defendants (1)

artificially increased the variable cost of natural gas, the key price input for the production of electricity by natural gas-fired power plants owned by Defendants and other generators in the New England Regional Market; (2) artificially increased demand for non-gas-fired power plants, many of which are owned or controlled by Defendants, which increased the market price for that electricity; (3) reduced the number of available natural gas-fired power plants competing in the market for wholesale electricity; (4) raised the price at which those gas plants who were able to compete in the market for wholesale electricity ultimately sold their electricity generation to Plaintiffs and the Classes. The net effect of Defendants' conduct was to artificially raise the price paid for electricity by Plaintiffs and the Classes.

62.     The Vertical Market Power Study analyzed millions of data points during the Class Period to demonstrate that Defendants systematically and repeatedly made day-ahead orders for natural gas capacity on the Algonquin Pipeline that they then canceled and, ultimately, resulted in the unused capacity that was unavailable to competitors despite unfulfilled demand for the delivery of natural gas.

63.     Defendants' reduction of supply was not insignificant. For example, based on the millions of data points analyzed, Defendants' cancellation of their day ahead orders reduced natural gas capacity to natural gas-fired power plants on the Algonquin Pipeline by approximately 14% or a daily average of 50,000 million British thermal units ("MMBtu") each day. Throughout the period, the Vertical Market Power Study identified 37 days on which Defendants' capacity restriction scheme reduced capacity on the Algonquin Pipeline by twice the average reduction or 28%, more than 100,000 MMBtu daily.

64.     The Defendants' scheme to artificially reduce the supply of natural gas on the natural gas spot market prices and on electricity prices in the ISO-NE region raised the spot price

of natural gas prices by 38% on average and nearly 70% during the winter months. That is, sudden and artificial increases in wholesale electricity prices caused by Defendants' manipulation directly and proximately resulted in substantially increased prices charged by LSEs to retail consumers, such as Plaintiffs and the proposed Class, throughout New England.

65.     As new information about natural gas demand for the following day becomes known, firms adjust their natural gas pipeline capacity orders throughout the day before the natural gas is to be used. The following figures demonstrate the typical natural gas transmission capacity order adjustments on the Algonquin pipeline as calculated by in the Vertical Market Power Study:[5]



66.     These figures show that, collectively, market participants' adjustments of capacity orders are concentrated in the period identified as the "Start of Gas Day" and taper off at the mid-point between the Start of the Gas Day and the "End of Gas Day." Defendants' conduct, however, is neither consistent with the pattern above nor explained by natural market forces and is

---

[5] The figures represent the scheduling pattern of a typical LDC delivery node. Each line represents one gas day during the Class Period. The X-axis covers the 44-hour scheduling period for each gas day and the Y-axis is the total daily quantity of gas scheduled for delivery to that node at a given time. Line color represents the Algonquin Citygate price (i.e., the point on the Algonquin Pipeline at which a distributing gas utility receives gas from the natural gas pipeline), wherein redder lines indicate higher-priced days. The scheduling pattern at this node and at most other LDC delivery nodes on Algonquin is characterized by most adjustments being made shortly after the timely cycle or around the start of the gas day with some slight balancing either direction in the final hours on some days.

23

inconsistent with the lawful conduct of its competitors. Other firms in the New England Regional Energy Market with a natural gas distribution business and electricity generating assets, at times, performed a small number of late downward capacity order adjustments on the Algonquin Pipeline. One such LDC – identified by the authors of the Vertical Market Power Study only as Firm C -- held a large number of no-notice contracts for natural gas transmission capacity on the Algonquin Pipeline like those held by Defendants. Yet Firm C, unlike Defendants, made only a fraction of the last-minute capacity order adjustments made by the Defendants. Of those, Firm C's average downward adjustments at its most adjusted pipeline node, a geographic point where capacity orders are placed and later adjusted, was a mere 229 MMBtu. By comparison, Defendants' average downward adjustments at their most adjusted pipeline nodes ranged from a high of 18,444 MMBtu to a low of 479 MMBtu.

67.    An analysis of six nodes operated by 27 parent energy firms that operate delivery locations, only two -- Defendants Avangrid and Eversource -- consistently made substantial downward adjustments in the final hours of the day. Researchers plotted the average natural gas schedule changes over each hour from the previous hour for a 44-hour scheduling period. The results are depicted below; each line represents the average behavior of one the 117 delivery nodes on the Algonquin Pipeline. Of those, six nodes operated by Avangrid (identified as "Firm A") and/or Eversource (identified as "Firm B"), are obvious outliers, demonstrating consistent large downward adjustments of capacity in the final hours of the gas day.

68.    Defendants' last-minute downward adjustments were substantially more frequent and of far greater size than any of their competitors who also supplied natural gas on the Algonquin Pipeline. For example, the Class Period spans 1,095 days. Nearly every single day of the Class Period -- 1,031 days in total -- Avangrid made at least one downward capacity order adjustment that was more than three standard deviations larger than the average order adjustment of all gas companies using the Algonquin Pipeline.

69.    In stark contrast to the pattern of capacity order adjustments throughout the day as demonstrated in the figures at paragraph 70, Avingrid's capacity order adjustments at a single natural gas pipeline node reveal a clear pattern of large last-minute downward adjustments throughout the year, as follows:[6]

---

[6] The y-axis in the figure corresponds to a total daily quantity of pipeline capacity used, meaning that the large downward adjustments correspond to unused pipeline capacity. For example, as explained in the Vertical Market Power Study, if a natural gas supplier supplying the node represented in the figure were to schedule 72,000 MMBtu at the beginning of the scheduling period, it is indicating to the pipeline company that it will be flowing gas at a rate of 72,000/24=3,000 MMBtu per hour over the course of the gas day. The pipeline company then reserves that capacity for the natural gas company that reserved the capacity. When the natural gas company reduces its scheduled quantity to 48,000 MMBtu three hours before the end of the gas day, it is not reducing its rate of flow at that time, but rather indicating to the pipeline company that it had been flowing gas at a rate of 2,000 MMBtu per hour over the gas day.



70.    Eversource likewise made at least one downward capacity order adjustment that was more than three standard deviations larger than the average order adjustment of all gas companies using the Algonquin Pipeline on one-third of the days in the Class Period – 351 in total.

71.    In stark contrast to the pattern of capacity order adjustments throughout the day as demonstrated in the figures at paragraph 70, Eversource's capacity order adjustments at a single natural gas pipeline node also reveal a clear pattern of large last-minute downward adjustments concentrated during the Winter months when prices are higher, as follows:



72.    Defendants' last-minute downward adjustments averaged many thousands of MMBtu per affected node compared with Firm C's high of just 229 MMBtu.

73.    Defendants' unique status as LDCs who were able to make penalty-free downward adjustments of their natural gas pipeline capacity day-ahead orders afforded them with a powerful

incentive – and the ability – to manipulate energy prices in the New England Regional Market by artificially raising and maintaining the energy price paid to electricity generators.

74.     Defendants' no-notice contracts enabled them to reserve less capacity one day in advance then they had and then increase their orders, when and if necessary, as information about demand for natural gas on the following day emerged. Doing so, however, would not have earned Defendants supracompetitive prices. As a result, they did just the opposite and reserved far more capacity than they needed only to cancel it at the last minute knowing that the capacity could not be filled thereby increasing electricity prices for Plaintiffs and the Classes and Defendants' profits.

### G.  Defendants' Manipulation of Natural Gas Capacity and Electricity Prices Also Increased the Value of their Renewable Energy Generation Assets and the Profits Earned from Them.

75.     During the Class Period Defendants owned substantial assets that generated electricity with low or no-cost fuel sources other than natural gas, i.e., "renewables", such as wind power. Defendants' manipulation of the prices for natural gas and electricity benefitted their electricity generation assets that did not rely on natural gas because the electricity generated from those sources became more competitive as natural gas generated electricity increased in price.

76.     Because, as alleged above, all electricity generating resources in the supply stack receive the same energy price on a given day, electricity generated from renewable sources becomes increasingly profitable as the daily clearing price rises due to the rising price of natural gas, which produces nearly half of all of the electricity produced in the New England Regional Market. In addition, Defendant Eversource also owns assets that generate electricity from non-renewable sources such as coal, oil, and biomass. The variable costs of coal, oil and biomass are more akin to that of natural gas. Therefore, as the spot price for natural gas rises so too does the price of electricity generated by Eversource from coal, oil, and biomass.

H.    **Defendants' Anticompetitive Conduct, As Alleged, Is the Subject of Numerous Governmental Regulatory Investigations or Reviews**

77.    Defendants' alleged manipulation of natural gas and electricity prices in New England is the subject of numerous investigations, reviews or calls for additional regulatory investigations.

78.    On October 17, 2017, in response to the Vertical Market Power Study, the Public Utilities Regulatory Authority (PURA) opened an investigation (Docket No. 17-10-31) into allegations that Eversource and Avangrid abused their market power by engaging in gas scheduling practices that deliberately manipulated the market to create shortage conditions that raised energy prices.

79.    On October 17, 2017, the Office of Consumer Counsel (OCC), the State of Connecticut's statutory advocate for utility customers, announced that it would participate actively in the investigation (Docket No. 17-10-31) opened by PURA.[7]

80.    At least six U.S. Senators from New England, Ed Markey (Mass.), Jack Reed (R.I.)., Sheldon Whitehouse (R.I.), Richard Blumenthal (Conn.) and Angus King (Maine) have called upon the Federal Energy Regulatory Commission (FERC) to conduct a full investigation into potential energy price manipulation by the Defendants in New England. In their letter to the FERC, the Senators wrote, in part, "[s]evere price increases like those we have seen in New England can hurt families and cripple businesses, especially manufacturers that rely on natural gas for power generation."

_____

[7] http://www.ct.gov/occ/lib/occ/press_release_on_gas_investigation_101717__.pdf

81.    Massachusetts Attorney General Maura Healey has stated that the Massachusetts Attorney General's office is conducting a "review" of alleged manipulation of energy prices in New England by Eversource and Avangrid.

## VI.    TOLLING OF STATUTE OF LIMITATIONS

82.    Plaintiffs and members of the Classes they represent could not have discovered through reasonable diligence that their electricity bills reflected artificially high prices during the Class Period as a result of Defendants' unlawful conduct. Rather, it took sophisticated academic research involving millions of data points and complicated statistical modeling to discover Defendants' conduct and its impacts on electricity consumers in New England. Within the time period of any applicable statutes of limitation, Plaintiffs and members of the Classes they represent could not have discovered through the exercise of reasonable diligence that Defendants were engaged in the unlawful and unfair conduct alleged in this Complaint. Plaintiffs and members of the Classes could not have reasonably detected Defendants' wrongdoing and were unlikely to even suspect it. Defendants and ISO-NE repeatedly blamed electricity price spikes during the Class Period on a lack of natural gas pipeline infrastructure rather while concealing their artificial restriction of existing pipeline capacity.

## VII.    CLASS ACTION ALLEGATIONS

83.    The claims in this action are brought by Plaintiffs on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. Excluded from each of the classes defined below are Defendants and their officers, directors, employees, affiliates, legal representatives, heirs, assigns, and any entity in which any Defendant has a legally controlling interest. Also excluded from each of the classes are any federal or state governmental

entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

A.    **Eversource Federal Law Class**

84.    Plaintiffs Nicholas Correia, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, and Judy Cennami bring claims for damages and other relief under federal antitrust law against Eversource, on behalf of themselves and a class of similarly situated electricity consumers in New England ("Federal Eversource Class"). The Federal Eversource Class is defined as follows: all consumers who purchased, during the Class Period, for their own use and not for resale, electricity in the ISO-NE market territory from Eversource and/or its subsidiaries or affiliates.

85.    The Federal Eversource Class is so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Federal Eversource Class is easily ascertainable, as each class member can be identified by using records in the possession of Eversource and/or its subsidiaries or affiliates. Through their counsel, Plaintiffs Nicholas Correia, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, and Judy Cennami are informed and believe that there are more than three million members of the Federal Eversource Class.

86.    Plaintiffs' federal antitrust claims against Eversource are typical of the claims of the Federal Eversource Class in that Plaintiffs purchased, during the Class Period, for their own use and not for resale, electricity in the ISO-NE market territory from Eversource and/or its subsidiaries. All members of the Federal Eversource Class were damaged by the same anticompetitive and wrongful conduct of Eversource.  The relief sought is common to all members of the Federal Eversource Class.

87.    Substantial questions of fact and law that are common to all members of the Federal Eversource Class, and which are susceptible to common answers and which control this litigation and predominate over any individual issues, include, inter alia, the following:

a.    Whether Eversource engaged in unfair and anticompetitive conduct by restricting natural gas transmission capacity along a key regional pipeline;

b.    Whether Eversource engaged in unfair and anticompetitive conduct by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the New England market;

c.    Whether Eversource's conduct in the natural gas segment of the New England energy market artificially inflated wholesale and retail power prices throughout the region during the Class Period;

d.    Whether Eversource's conduct injured Plaintiffs and all members of the Federal Eversource Class, and, if so, the appropriate class-wide measure of damages for Plaintiffs and all members of the Federal Eversource Class; and

e.    Whether Plaintiffs and all other members of the Federal Eversource Class are entitled to, *inter alia*, injunctive relief, and if so, the nature and extent of such injunctive relief.

88.    Plaintiffs' claims are typical of the claims of members of the Federal Eversource Class as they arise out of the same course of conduct and the same legal theories as the claims of

all members of the Federal Eversource Class.  Plaintiffs challenge the practices and course of conduct engaged in by Eversource with respect to the Federal Eversource Class as a whole.

89.     Plaintiffs will fairly and adequately protect the interests of the Federal Eversource Class. Plaintiff has retained class counsel who are experienced in the prosecution of complex antitrust and consumer class actions.

90.     Resolution of Plaintiffs' claims against Eversource for damages and other relief under federal antitrust law on a class-wide basis is superior to other available methods and will result in a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Federal Eversource Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Eversource. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Eversource and substantially impede or impair the ability of members of the Federal Eversource Class to pursue their claims. Injunctive relief appropriate with respect to the Eversource Federal Law Class as a whole because Eversource's conduct as alleged herein is generally applicable to millions of individuals.

**B.     Avangrid Federal Law Class**

91.     Plaintiffs Janice Brady and Opal Ash bring claim for damages and other relief under federal antitrust law against Avangrid, on behalf of themselves and a class of similarly situated electricity consumers in New England ("Federal Avangrid Class"). The Federal Avangrid Class is defined as follows: all consumers who purchased, during the Class Period, for their own use and not for resale, electricity in the ISO-NE market territory from Avangrid and/or its subsidiaries or affiliates.

92.    The Federal Avangrid Class is so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Federal Avangrid Class is easily ascertainable, as each class member can be identified by using records in the possession of Avangrid and/or its subsidiaries or affiliates. Through their counsel, Plaintiffs are informed and believes that there are more than three million members of the Federal Avangrid Class.

93.    Plaintiffs' federal antitrust claims against Avangrid are typical of the claims of the Federal Avangrid Class in that Plaintiffs purchased, during the Class Period, for their own use and not for resale, electricity in the ISO-NE market territory from Avangrid and/or its subsidiaries. All members of the Federal Avangrid Class were damaged by the same anticompetitive and wrongful conduct of Avangrid.  The relief sought is common to all members of the Federal Avangrid Class.

94.    Substantial questions of fact and law that are common to all members of the Federal Avangrid Class, and which are susceptible to common answers and which control this litigation and predominate over any individual issues, include, inter alia, the following:

a.    Whether Avangrid engaged in unfair and anticompetitive conduct by restricting natural gas transmission capacity along a key regional pipeline;

b.    Whether Avangrid engaged in unfair and anticompetitive conduct by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the New England market;

c.     Whether Avangrid's conduct in the natural gas segment of the New England Regional Market artificially inflated wholesale and retail power prices throughout the region during the Class Period;

d.     Whether Avangrid's conduct injured Plaintiffs and all members of the Federal Avangrid Class, and, if so, the appropriate class-wide measure of damages for Plaintiffs and all members of the Federal Avangrid Class; and

e.     Whether Plaintiffs and all other members of the Federal Avangrid Class are entitled to, *inter alia*, injunctive relief, and if so, the nature and extent of such injunctive relief.

95.     Plaintiffs' claims are typical of the claims of members of the Federal Avangrid Class as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Federal Avangrid Class. Plaintiffs challenge the practices and course of conduct engaged in by Avangrid with respect to the Federal Avangrid Class as a whole.

96.     Plaintiffs will fairly and adequately protect the interests of the Federal Avangrid Class. Plaintiffs have retained class counsel who are experienced in the prosecution of complex antitrust and consumer class actions.

97.     Resolution of Plaintiffs' claims against Avangrid for damages and other relief under federal antitrust law on a class-wide basis is superior to other available methods and will result in a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Federal Avangrid Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Avangrid. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which

could establish incompatible standards of conduct for Avangrid and substantially impede or impair the ability of members of the Federal Avangrid Class to pursue their claims. Injunctive relief appropriate with respect to the Avangrid Federal Law Class as a whole because Avangrid's conduct as alleged herein is generally applicable to millions of individuals.

C.    **Federal Injunctive Relief Class**

98.    Plaintiffs bring claims for injunctive relief under federal antitrust law against Defendants, on behalf of themselves and a class of all electricity consumers in New England ("Federal Injunctive Relief Class"). The Federal Injunctive Relief Class is defined as follows: all consumers who purchased, during the Class Period, for their own use and not for resale, electricity in the ISO-NE market territory of New England from Defendants or their subsidiaries.

99.    The Federal Injunctive Relief Class is so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Federal Injunctive Relief Class is easily ascertainable, as each class member can be identified by using records in the possession of Defendants and/or their subsidiaries. Through their counsel, Plaintiffs are informed and believe that there are at least 900,000 members of the Federal Injunctive Relief Class.

100.    Plaintiffs' federal antitrust claims against Defendants are typical of the claims of the Federal Injunctive Relief Class in that Plaintiffs purchased, during the Class Period, for their own use and not for resale, electricity in the ISO-NE market territory from Defendants and/or their subsidiaries. All members of the Federal Injunctive Relief Class were damaged by the same wrongful conduct of Defendants, and the relief sought is common to all members of the Federal Injunctive Relief Class.

101.    Substantial questions of fact and law that are common to all members of the Federal Injunctive Relief Class, and which are susceptible to common answers and which control this litigation and predominate over any individual issues, include, inter alia, the following:

    a.    Whether Defendants engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas transmission capacity on the Algonquin Pipeline;

    b.    Whether Defendants engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the region;

    c.    Whether Defendants' conduct in the natural gas segment of the New England energy market artificially inflated wholesale and retail power prices throughout the region during the Class Period;

    d.    Whether Defendants' conduct injured Plaintiffs and all members of the Federal Injunctive Relief Class and threatens further injury; and

    e.    Whether Plaintiffs and all other members of the Federal Injunctive Relief Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

102.    Plaintiffs' claims are typical of the claims of members of the Federal Injunctive Relief Class as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Federal Injunctive Relief Class, and Plaintiffs challenge the practices

36

and course of conduct engaged in by Defendants with respect to the Federal Injunctive Relief Class as a whole.

103.    Plaintiffs will fairly and adequately protect the interests of the Federal Injunctive Relief Class. Plaintiffs have retained class counsel who are experienced in the prosecution of complex antitrust and consumer class actions.

104.    Resolution of Plaintiffs' claims for injunctive relief under federal antitrust law against Defendants on a class-wide basis is superior to other available methods and will result in a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Federal Injunctive Relief Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of members of the Federal Injunctive Relief Class to pursue their claims. Injunctive relief appropriate with respect to the Federal Injunctive Relief Class as a whole because Defendants' conduct as alleged herein is generally applicable to millions of individuals.

**D.    Eversource State Law Classes – Asserting State Law Claims Against Eversource**

105.    Plaintiffs bring state-law claims against Eversource on behalf of themselves and state-specific subclasses (collectively, the "Eversource State Law Classes"), under the relevant laws of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. The Eversource State Law Classes are defined as follows:

> a.    Eversource Connecticut State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Connecticut.

b. Eversource Maine State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Maine.

c. Eversource Massachusetts State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Massachusetts.

d. Eversource New Hampshire State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in New Hampshire.

e. Eversource Rhode Island State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Rhode Island.

f. Eversource Vermont State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Vermont.

106.    Each of the Eversource State Law Classes is so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of each of the Eversource State Law Classes is easily ascertainable, as each class member can be identified by using readily obtainable records, including publicly available records and records in the possession of Eversource and/or its subsidiaries or affiliates. Through their counsel, Plaintiffs are informed and believe that there are tens of thousands or more members of each of the Eversource State Law Classes and millions of members of the Eversource State Law Classes collectively.

107.    Plaintiffs' state-law claims against Eversource are typical of the claims of the Eversource State Law Classes in that Plaintiffs purchased, during the Class Period, for their own

use and not for resale, electricity in the ISO-NE territory of New England. All members of the Eversource State Law Classes were damaged by the same wrongful conduct of Eversource, and the relief sought is common to all members of the Eversource State Law Classes.

108.    Substantial questions of fact and law that are common to all members of the Eversource State Law Classes, and which are susceptible to common answers and which control this litigation and predominate over any individual issues, include, inter alia, the following:

    a.  Whether Eversource engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas transmission capacity along a key regional pipeline;

    b.  Whether Eversource engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the region;

    c.  Whether Eversource's conduct caused substantial injury to Plaintiffs, the Eversource State Law Classes, and the public interest;

    d.  Whether Eversource's conduct caused artificially inflated wholesale and retail power prices throughout the region during the Class Period;

    e.  Whether Everource knowingly received a benefit conferred by Plaintiffs and the Eversource State Law Classes, and whether retention of such a benefit would be inequitable or unjust under the circumstances;

    f.  Whether Eversource's conduct injured Plaintiffs and all members of the Eversource State Law Classes, and, if so, the appropriate class-wide measure

of damages for Plaintiffs and all members of the Eversource State Law

Classes; and

g.  Whether Plaintiffs and all other members of the Eversource State Law

Classes are entitled to, among other things, injunctive relief, and if so, the

nature and extent of such injunctive relief.

109.    Plaintiffs' claims are typical of the claims of members of the Eversource State Law

Classes as they arise out of the same course of conduct and the same legal theories as the claims

of all members of the Eversource State Law Classes, and Plaintiffs challenge the practices and

course of conduct engaged in by Eversource with respect to the Eversource State Law Classes as

a whole.

110.    Plaintiffs will fairly and adequately protect the interests of the Eversource State

Law Classes. Plaintiffs have retained class counsel who are experienced in the prosecution of

complex antitrust and consumer class actions.

111.    Resolution of Plaintiff's state-law claims against Eversource on a class-wide basis

is superior to other available methods and is a fair and efficient adjudication of the controversy

because in the context of this litigation, no individual member of the Eversource State Law Classes

can justify the commitment of the large financial resources to vigorously prosecute a lawsuit

against Eversource. Separate actions by individual class members would also create a risk of

inconsistent or varying judgments, which could establish incompatible standards of conduct for

Eversource and substantially impede or impair the ability of members of the Eversource State Law

Classes to pursue their claims. Injunctive relief is appropriate with respect to the Eversource State

Law Classes because Eversource's conduct is generally applicable to millions of individuals.

E.     **Avangrid State Law Classes – Asserting State Law Claims Against Avangrid**

112.     Plaintiffs bring state-law claims against Avangrid on behalf of themselves and state-specific subclasses (collectively, the "Avangrid State Law Classes"), under the relevant laws of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. The Avangrid State Law Classes are defined as follows:

> a.   Avangrid Connecticut State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Connecticut.
>
> b.   Avangrid Maine State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Maine.
>
> c.   Avangrid Massachusetts State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Massachusetts.
>
> d.   Avangrid New Hampshire State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in New Hampshire.
>
> e.   Avangrid Rhode Island State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Rhode Island.
>
> f.   Avangrid Vermont State Law Class: all consumers who purchased, during the Class Period, for their own use and not for resale electricity in Vermont.

113.     Each of the Avangrid State Law Classes is so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number

of such persons is unknown, the exact size of each of the Avangrid State Law Classes is easily ascertainable, as each class member can be identified by using readily obtainable records, including publicly available records and records in the possession of Avangrid and/or its subsidiaries or affiliates. Through their counsel, Plaintiffs are informed and believe that there are tens of thousands or more members of each of the Avangrid State Law Classes and millions of members of the Avangrid State Law Classes collectively.

114.    Plaintiffs' state-law claims against Avangrid are typical of the claims of the Avangrid State Law Classes in that Plaintiffs purchased, during the Class Period, for their own use and not for resale, electricity in the ISO-NE territory of New England. All members of the Avangrid State Law Classes were damaged by the same wrongful conduct of Avangrid, and the relief sought is common to all members of the Avangrid State Law Classes.

115.    Substantial questions of fact and law that are common to all members of the Avangrid Maine State Law Class, and which are susceptible to common answers and which control this litigation and predominate over any individual issues, include, inter alia, the following:

    a.    Whether Avangrid engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas transmission capacity along a key regional pipeline;

    b.    Whether Avangrid engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the region;

    c.    Whether Avangrid's conduct caused substantial injury to Plaintiffs, the Avangrid State Law Classes and the public interest;

42

    d.   Whether Avangrid's conduct caused artificially inflated wholesale and retail power prices throughout the region during the Class Period;

    e.   Whether Avangrid knowingly received a benefit conferred by Plaintiffs and the Avangrid State Law Classes, and whether retention of such a benefit would be inequitable or unjust under the circumstances;

    f.   Whether Avangrid's conduct injured Plaintiffs and all members of the Avangrid State Law Classes, and, if so, the appropriate class-wide measure of damages for Plaintiffs and all members of the Avangrid State Law Classes; and

    g.   Whether Plaintiffs and all other members of the Avangrid State Law Classes are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

116.    Plaintiffs' claims are typical of the claims of members of the Avangrid Maine State Law Class as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Avangrid State Law Classes, and Plaintiffs challenge the practices and course of conduct engaged in by Avangrid with respect to the Avangrid State Law Classes as a whole.

117.    Plaintiffs will fairly and adequately protect the interests of the Avangrid State Law Classes. Plaintiffs have retained class counsel who are experienced in the prosecution of complex antitrust and consumer class actions.

118.    Resolution of Plaintiffs' state-law claims against Avangrid on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Avangrid State Law Classes can justify the commitment of the large financial resources to vigorously prosecute a lawsuit

against Avangrid. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Avangrid and substantially impede or impair the ability of members of the Avangrid State Law Classes to pursue their claims. Injunctive relief is appropriate with respect to the Avangrid State Law Classes because Avangrid's conduct is generally applicable to millions of individuals.

### VIII.   VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF

### (EVERSOURCE PLAINTIFFS' AND AVANGRID PLAINTIFFS' CLAIMS FOR DAMAGES AND OTHER RELIEF UNDER FEDERAL ANTITRUST LAWS)

119.    Plaintiffs incorporate by reference all of the preceding allegations.

120.    Defendants regularly engage in interstate commerce within the ISO-NE market territory.

121.    During the Class Period, Defendants each unlawfully monopolized and/or attempted to monopolize trade or commerce within and among the six New England states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

122.    Defendants' unlawful conduct in the natural gas segment of the New England energy market had the effect of artificially constraining natural gas transmission capacity, artificially restricting natural gas supplies available on the natural gas spot market, and artificially increasing the spot market price of natural gas in the region. This unlawful conduct allowed Defendants to covertly manipulate natural competitive forces in the electricity segment of the New England energy market, with the effect of artificially inflating wholesale and retail electricity prices throughout the ISO-NE market territory during the Class Period. Defendants' conduct caused Eversource and Avangrid Plaintiffs, and members of the Eversource and Avangrid Federal

Law Classes, to pay artificially high prices for electricity sold by Defendants and/or their subsidiaries.

123.     During the Class Period, Defendants' illegal conduct had a substantial effect on interstate commerce.

124.     As a direct and proximate result of Defendants' unlawful conduct, Eversource and Avangrid Plaintiffs, and members of the Eversource and Avangrid Federal Law Classes, have been injured in their business and property and are threatened with further injury.

125.     Defendants and their subsidiaries and/or affiliates comprise a web of entities that are functionally and economically unified under common ownership or control. As a result, there is no realistic possibility that Defendants and/or their subsidiaries or affiliates will seek to enforce the federal antitrust laws as against one another. Because Eversource and Avangrid Plaintiffs' federal antitrust claims against Defendants therefore do not pose a risk of multiple recovery, those claims will serve a vital part of the antitrust enforcement scheme under federal law.

126.     Eversource and Avangrid Plaintiffs, on behalf of themselves and members of the Eversource and Avangrid Federal Law Classes, seek all damages and other relief available under the Sherman and Clayton Acts, including but not limited to treble damages, attorneys' fees, and costs of suit, from both Eversource and Avangrid.

## SECOND CLAIM FOR RELIEF

### (PLAINTIFFS' CLAIM FOR
### INJUNCTIVE RELIEF UNDER FEDERAL ANTITRUST LAW)

127.     Plaintiffs incorporate by reference all of the preceding allegations.

128.     Defendants regularly engage in interstate commerce within the ISO-NE market territory.

129.     During the Class Period, Defendants unlawfully monopolized and/or attempted to monopolize trade or commerce within and among the six New England states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

130.     Defendants' unlawful conduct in the natural gas segment of the New England energy market has had the effect of artificially constraining natural gas transmission capacity, artificially restricting natural gas supplies available on the natural gas spot market, and artificially increasing the spot market price of natural gas in the region. This unlawful conduct has allowed Defendants to covertly manipulate natural competitive forces in the electricity segment of the New England energy market, with the effect of artificially inflated wholesale and retail electricity prices throughout the ISO-NE market territory during the Class Period. Defendants' conduct has caused and threatens to further cause Plaintiffs, and members of the Federal Injunctive Relief Class, to pay artificially high prices for electricity sold by Defendants and/or their subsidiaries.

131.     During the Class Period, Defendants' illegal conduct has had a substantial effect on interstate commerce.

132.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs, and members of the Federal Injunctive Relief Class, have been injured in their business and property and are threatened with further injury.

133.     Defendants and their subsidiaries and/or affiliates comprise a web of entities that are functionally and economically unified under common ownership or control. As a result, there is no realistic possibility that Defendants and/or their subsidiaries or affiliates will seek to enforce the federal antitrust laws as against one another. Because Plaintiffs' federal antitrust claims against Defendants therefore do not pose a risk of multiple recovery, those claims will serve a vital part of the antitrust enforcement scheme under federal law.

46

134.    Plaintiffs, on behalf of themselves and members of the Federal Injunctive Relief Class, seek injunctive relief under the Clayton Act, 15 U.S.C. § 26, including but not limited to an order enjoining Defendants from further engaging in the unlawful conduct described in this Complaint.

### THIRD CLAIM FOR RELIEF

### (PLAINTIFFS' CLAIMS FOR UNJUST ENRICHMENT AGAINST EVERSOURCE UNDER LAWS OF INDIVIDUAL STATES)

135.    Plaintiffs incorporate by reference all of the preceding allegations.

136.    Plaintiffs allege unjust enrichment claims against Eversource under the laws of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont on behalf of themselves and members of the Eversource State Law Classes, as set forth in further detail below.

137.    As a direct and proximate result of Eversource's unlawful conduct, Eversource was unjustly enriched to the unjust detriment of all members of the Eversource Connecticut State Law Class. Eversource has knowingly accepted a benefit conferred by Plaintiffs and members of the Eversource Connecticut State Law Class, to the detriment of the Plaintiffs and members of the Eversource Connecticut State Law Class, under circumstances in which it would be inequitable and/or unjust for Eversource to retain that benefit.

138.    Plaintiffs, on behalf of the Eversource Connecticut State Law Class, seek all available and appropriate relief under Connecticut law for Eversource's unlawful conduct and corresponding unjust enrichment.

139.    As a direct and proximate result of Eversource's unlawful conduct, Eversource was unjustly enriched to the unjust detriment of all members of the Eversource Maine State Law Class. Eversource has knowingly accepted a benefit conferred by Plaintiffs and members of the Eversource Maine State Law Class, to the detriment of the Plaintiffs and members of the

47

Eversource Maine State Law Class, under circumstances in which it would be inequitable and/or unjust for Eversource to retain that benefit.

140.    Plaintiffs, on behalf of the Eversource Maine State Law Class, seek all available and appropriate relief under Maine law for Eversource's unlawful conduct and corresponding unjust enrichment.

141.    As a direct and proximate result of Eversource's unlawful conduct, Eversource was unjustly enriched to the unjust detriment of all members of the Eversource Massachusetts State Law Class. Eversource has knowingly accepted a benefit conferred by Plaintiffs and members of the Eversource Massachusetts State Law Class, to the detriment of the Plaintiffs and members of the Eversource Massachusetts State Law Class, under circumstances in which it would be inequitable and/or unjust for Eversource to retain that benefit.

142.    Plaintiffs, on behalf of the Eversource Massachusetts State Law Class, seek all available and appropriate relief under Massachusetts law for Eversource's unlawful conduct and corresponding unjust enrichment.

143.    As a direct and proximate result of Eversource's unlawful conduct, Eversource was unjustly enriched to the unjust detriment of all members of the Eversource New Hampshire State Law Class. Eversource has knowingly accepted a benefit conferred by Plaintiffs and members of the Eversource New Hampshire State Law Class, to the detriment of the Plaintiffs and members of the Eversource New Hampshire State Law Class, under circumstances in which it would be inequitable and/or unjust for Eversource to retain that benefit.

144.    Plaintiffs, on behalf of the Eversource New Hampshire State Law Class, seek all available and appropriate relief under New Hampshire law for Eversource's unlawful conduct and corresponding unjust enrichment.

145.    As a direct and proximate result of Eversource's unlawful conduct, Eversource was unjustly enriched to the unjust detriment of all members of the Eversource Rhode Island State Law Class. Eversource has knowingly accepted a benefit conferred by Plaintiffs and members of the Eversource Rhode Island State Law Class, to the detriment of the Plaintiffs and members of the Eversource Rhode Island State Law Class, under circumstances in which it would be inequitable and/or unjust for Eversource to retain that benefit.

146.    Plaintiffs, on behalf of the Eversource Rhode Island State Law Class, seek all available and appropriate relief under Rhode Island law for Eversource's unlawful conduct and corresponding unjust enrichment.

147.    As a direct and proximate result of Eversource's unlawful conduct, Eversource was unjustly enriched to the unjust detriment of all members of the Eversource Vermont State Law Class. Eversource has knowingly accepted a benefit conferred by Plaintiffs and members of the Eversource Vermont State Law Class, to the detriment of the Plaintiffs and members of the Eversource Vermont State Law Class, under circumstances in which it would be inequitable and/or unjust for Eversource to retain that benefit.

148.    Plaintiffs, on behalf of the Eversource Vermont State Law Class, seek all available and appropriate relief under Vermont law for Eversource's unlawful conduct and corresponding unjust enrichment.

## FOURTH CLAIM FOR RELIEF

## (PLAINTIFFS' CLAIMS FOR UNJUST ENRICHMENT AGAINST AVANGRID UNDER LAWS OF INDIVIDUAL STATES)

149.    Plaintiffs incorporate by reference all of the preceding allegations.

150.     Plaintiffs allege unjust enrichment claims against Avangrid under the laws of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont on behalf of themselves and members of the Avangrid State Law Classes, as set forth in further detail below.

151.     As a direct and proximate result of Avangrid's unlawful conduct, Avangrid was unjustly enriched to the unjust detriment of all members of the Avangrid Connecticut State Law Class. Avangrid has knowingly accepted a benefit conferred by Plaintiffs and members of the Avangrid Connecticut State Law Class, to the detriment of the Plaintiffs and members of the Avangrid Connecticut State Law Class, under circumstances in which it would be inequitable and/or unjust for Avangrid to retain that benefit.

152.     Plaintiffs, on behalf of the Avangrid Connecticut State Law Class, seek all available and appropriate relief under Connecticut law for Avangrid's unlawful conduct and corresponding unjust enrichment.

153.     As a direct and proximate result of Avangrid's unlawful conduct, Avangrid was unjustly enriched to the unjust detriment of all members of the Avangrid Maine State Law Class. Avangrid has knowingly accepted a benefit conferred by Plaintiffs and members of the Avangrid Maine State Law Class, to the detriment of the Plaintiffs and members of the Avangrid Maine State Law Class, under circumstances in which it would be inequitable and/or unjust for Avangrid to retain that benefit.

154.     Plaintiffs, on behalf of the Avangrid Maine State Law Class, seek all available and appropriate relief under Maine law for Avangrid's unlawful conduct and corresponding unjust enrichment.

155.     As a direct and proximate result of Avangrid's unlawful conduct, Avangrid was unjustly enriched to the unjust detriment of all members of the Avangrid Massachusetts State Law

Class. Avangrid has knowingly accepted a benefit conferred by Plaintiffs and members of the Avangrid Massachusetts State Law Class, to the detriment of the Plaintiffs and members of the Avangrid Massachusetts State Law Class, under circumstances in which it would be inequitable and/or unjust for Avangrid to retain that benefit.

156.    Plaintiffs, on behalf of the Avangrid Massachusetts State Law Class, seek all available and appropriate relief under Massachusetts law for Avangrid's unlawful conduct and corresponding unjust enrichment.

157.    As a direct and proximate result of Avangrid's unlawful conduct, Avangrid was unjustly enriched to the unjust detriment of all members of the Avangrid New Hampshire State Law Class. Avangrid has knowingly accepted a benefit conferred by Plaintiffs and members of the Avangrid New Hampshire State Law Class, to the detriment of the Plaintiffs and members of the Avangrid New Hampshire State Law Class, under circumstances in which it would be inequitable and/or unjust for Avangrid to retain that benefit.

158.    Plaintiffs, on behalf of the Avangrid New Hampshire State Law Class, seek all available and appropriate relief under New Hampshire law for Avangrid's unlawful conduct and corresponding unjust enrichment.

159.    As a direct and proximate result of Avangrid's unlawful conduct, Avangrid was unjustly enriched to the unjust detriment of all members of the Avangrid Rhode Island State Law Class. Avangrid has knowingly accepted a benefit conferred by Plaintiffs and members of the Avangrid Rhode Island State Law Class, to the detriment of the Plaintiffs and members of the Avangrid Rhode Island State Law Class, under circumstances in which it would be inequitable and/or unjust for Avangrid to retain that benefit.

160.    Plaintiffs, on behalf of the Avangrid Rhode Island State Law Class, seek all available and appropriate relief under Rhode Island law for Avangrid's unlawful conduct and corresponding unjust enrichment.

161.    As a direct and proximate result of Avangrid's unlawful conduct, Avangrid was unjustly enriched to the unjust detriment of all members of the Avangrid Vermont State Law Class. Avangrid has knowingly accepted a benefit conferred by Plaintiffs and members of the Avangrid Vermont State Law Class, to the detriment of the Plaintiffs and members of the Avangrid Vermont State Law Class, under circumstances in which it would be inequitable and/or unjust for Avangrid to retain that benefit.

162.    Plaintiffs, on behalf of the Avangrid Vermont State Law Class, seek all available and appropriate relief under Vermont law for Avangrid's unlawful conduct and corresponding unjust enrichment.

### FIFTH CLAIM FOR RELIEF

### (PLAINTIFFS' CLAIMS AGAINST EVERSOURCE UNDER STATE CONSUMER PROTECTION AND ANTITRUST LAWS)

163.    Plaintiffs incorporate by reference all of the preceding allegations.

164.    Eversource's unlawful conduct has violated the state consumer protection and/or antitrust laws of Connecticut, New Hampshire, Rhode Island, and Vermont.

165.    Eversource's unlawful conduct has violated Connecticut's Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a et seq. Plaintiffs, on behalf of themselves and the Eversource Connecticut State Law Class, allege as follows:

    a.    During the Class Period, Eversource's unlawful conduct substantially affected Connecticut commerce and consumers, and it had a substantial impact on the public interests of Connecticut and its residents.

b.      As a direct and proximate result of Eversource's unlawful conduct, Plaintiffs and all members of the Connecticut State Law Class have been injured and are threatened with further injury.

c.      Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Connecticut, in violation of the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110b.

d.      Accordingly, Plaintiffs, on behalf of themselves and the Connecticut State Law Class, seek all relief that is available and appropriate, including any relief available under the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110g.

166.    Eversource's unlawful conduct has violated New Hampshire's Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:1 et seq. Plaintiffs, on behalf of the Eversource New Hampshire State Law Class, allege as follows:

a.      During the Class Period, Eversource's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

b.      As a direct and proximate result of Eversource's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

c.      Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting

New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

    d.    Accordingly, Plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

167.    Eversource's unlawful conduct has violated Rhode Island's Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws 1956, § 6-13.1-2 et seq. Plaintiffs, on behalf of the Eversource Rhode Island State Law Class, allege as follows:

    a.    During the Class Period, Eversource's unlawful conduct substantially affected Rhode Island commerce and consumers, and it had a substantial impact on the public interests of Rhode Island and its residents.

    b.    As a direct and proximate result of Eversource's unlawful conduct, all members of the Rhode Island State Law Class have been injured and are threatened with further injury.

    c.    Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Rhode Island, in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, including, R.I. Gen. Laws 1956, § 6-13.1-2.

    d.    Accordingly, Plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the Rhode Island Unfair Trade Practice and Consumer Protection Act.

54

168.    Eversource's unlawful conduct has violated the Vermont Consumer Fraud Act, VT. STAT. ANN. tit. 9, § 2451 *et seq*. Plaintiffs, on behalf of themselves and the Vermont State Law Class, allege as follows:

a.    During the Class Period, Eversource's unlawful conduct substantially affected Vermont commerce and customers, and it had a substantial impact on the public interests of Vermont and its residents.

b.    As a direct and proximate result of Eversource's unlawful conduct, Plaintiffs and all members of the Vermont State Law Class have been injured in their business and property and are threatened with further injury.

c.    Eversource's unlawful conduct has constituted or included unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, in violation of the Vermont Consumer Fraud Act, including VT. STAT. ANN. tit. 9, § 2453.

d.    Accordingly, Plaintiffs, on behalf of themselves and the Vermont State Law Class, seek all relief that is available and appropriate, including any relief available under the Vermont Consumer Fraud Act.

169.    On January 8, 2018, Plaintiffs residing in Massachusetts, on behalf of themselves and all members of the Eversource Massachusetts State Law Class, mailed to Eversource a written demand for relief pursuant to the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A, § 1 et seq. Plaintiffs may amend this Complaint to include claims against Eversource

under the Massachusetts Consumer Protection Act on behalf of themselves and the Eversource

Massachusetts State Law Class if Eversource does not respond to this demand adequately within

a reasonable time.

**SIXTH CLAIM FOR RELIEF**

**(PLAINTIFFS' CLAIMS AGAINST AVANGRID UNDER MAINE STATE CONSUMER PROTECTION AND ANTITRUST LAWS)**

170.    Plaintiffs incorporate by reference all of the preceding allegations.

171.    Avangrid's unlawful conduct has violated the state consumer protection and/or

antitrust laws of Connecticut, New Hampshire, Rhode Island, and Vermont.

172.    Avangrid's unlawful conduct has violated Connecticut's Unfair Trade Practices

Act, CONN. GEN. STAT. § 42-110a et seq. Plaintiffs, on behalf of themselves and the Avangrid

Connecticut State Law Class, allege as follows:

      a.    During the Class Period, Avangrid's unlawful conduct substantially affected Connecticut commerce and consumers, and it had a substantial impact on the public interests of Connecticut and its residents.

      b.    As a direct and proximate result of Avangrid's unlawful conduct, Plaintiffs and all members of the Connecticut State Law Class have been injured and are threatened with further injury.

      c.    Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Connecticut, in violation of the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110b.

      d.    Accordingly, Plaintiffs, on behalf of themselves and the Connecticut State Law Class, seek all relief that is available and appropriate, including any

56

relief available under the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110g.

173.    Avangrid's unlawful conduct has violated New Hampshire's Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:1 et seq. Plaintiffs, on behalf of the Avangrid New Hampshire State Law Class, allege as follows:

a.    During the Class Period, Avangrid's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

b.    As a direct and proximate result of Avangrid's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

c.    Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

d.    Accordingly, Plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

174.    Avangrid's unlawful conduct has violated Rhode Island's Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws 1956, § 6-13.1-2 et seq. Plaintiffs, on behalf of the Avangrid Rhode Island State Law Class, allege as follows:

a.     During the Class Period, Avangrid's unlawful conduct substantially affected Rhode Island commerce and consumers, and it had a substantial impact on the public interests of Rhode Island and its residents.

b.     As a direct and proximate result of Avangrid's unlawful conduct, all members of the Rhode Island State Law Class have been injured and are threatened with further injury.

c.     Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Rhode Island, in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, including, R.I. Gen. Laws 1956, § 6-13.1-2.

d.     Accordingly, Plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the Rhode Island Unfair Trade Practice and Consumer Protection Act.

175.    Avangrid's unlawful conduct has violated the Vermont Consumer Fraud Act, VT. STAT. ANN. tit. 9, § 2451 *et seq*. Plaintiffs, on behalf of themselves and the Vermont State Law Class, allege as follows:

a.     During the Class Period, Avangrid's unlawful conduct substantially affected Vermont commerce and customers, and it had a substantial impact on the public interests of Vermont and its residents.

b.     As a direct and proximate result of Avangrid's unlawful conduct, Plaintiffs and all members of the Vermont State Law Class have

been injured in their business and property and are threatened with further injury.

c.    Avangrid's unlawful conduct has constituted or included unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, in violation of the Vermont Consumer Fraud Act, including VT. STAT. ANN. tit. 9, § 2453.

d.    Accordingly, Plaintiffs, on behalf of themselves and the Vermont State Law Class, seek all relief that is available and appropriate, including any relief available under the Vermont Consumer Fraud Act.

176.    On January 8, 2018, Plaintiffs residing in Maine, on behalf of themselves and members of the Avangrid Maine State Law Class, mailed to Avangrid a written demand for relief pursuant to the Maine Unfair Trade Practices Act, ME. STAT. TIT. 5, § 205-A et seq. Plaintiffs may amend this Complaint to include claims against Avangrid under the Maine Consumer Protection Act on behalf of themselves and the Avangrid Maine State Law Class if Avangrid does not respond to this demand adequately within a reasonable time.

## DEMAND FOR RELIEF

As a result of Defendants' unlawful conduct, as alleged in this Complaint, Plaintiffs demand that this Court enter a judgment and determination on their behalf, and on behalf of the classes they represent, that:

A.    This action may proceed as a class action, with Plaintiffs as the designated class representatives and their counsel as class counsel for their respective classes;

B.     Defendants, through their unlawful conduct, have unjustly enriched themselves to the unjust detriment of Plaintiffs and members of their respective classes under circumstances in which it would be inequitable to allow Defendants to keep the benefit conferred upon them;

C.     Defendants' unlawful conduct has violated the consumer protection laws of Connecticut, New Hampshire, Rhode Island, and Vermont, resulting in injury to Plaintiffs and members of their respective classes;

D.     Defendants have monopolized and/or attempted to monopolize trade or commerce among the several states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Plaintiffs and members of their respective classes have been injured in their businesses and property, and are threatened with further injury, as a result of Defendants' unlawful conduct;

E.     Plaintiffs and members of their respective classes are entitled to recover damages sustained by them, as well as restitution or disgorgement, as provided by the relevant federal and state antitrust and consumer protection laws, and by the law of unjust enrichment in the relevant states in which Plaintiffs reside, and that a joint and several judgment in favor of Plaintiffs and their respective classes be entered against the Defendants in an amount to be trebled in accordance with such laws;

F.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the monopolies and unfair business practices alleged herein;

G.     Plaintiffs and the members of their respective classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

60

H.    Plaintiffs and the members of their respective classes recover their costs of this suit, including reasonable attorneys' fees and costs as provided by law; and

I.    Plaintiffs and the members of their respective classes receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  February 6, 2018

HAGENS BERMAN SOBOL SHAPIRO LLP

By

Thomas M. Sobol (BBO # 471770)
Kristie LaSalle (BBO # 692891)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
kristiel@hbsslaw.com

*Local counsel for Plaintiffs and the proposed Classes*

BERGER & MONTAGUE, P.C.
David F. Sorensen (*pro hac vice forthcoming*)
Michael Dell'Angelo (*pro hac vice forthcoming*)
Glen L. Abramson (*pro hac vice forthcoming*)
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Facsimile: (215) 875-4604
dsorensen@bm.net
mdellangelo@bm.net
gabramson@bm.net

*Counsel for Plaintiffs and the proposed Classes*